# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2011AP2758-D |
| COMPLETE TITLE: | In the Matter of Disciplinary Proceedings Against Kenneth R. Kratz, Attorney at Law: |
| | Office of Lawyer Regulation,<br>            Complainant,<br>      v.<br>Kenneth R. Kratz,<br>            Respondent. |

DISCIPLINARY PROCEEDINGS AGAINST KRATZ

| | |
|---|---|
| OPINION FILED: | June 6, 2014 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | |
| COUNTY: | |
| JUDGE: | |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | ABRAHAMSON, C.J., concurs. (Opinion filed.) |
| CONCUR/DISSENT: | PROSSER, J., concurs in part; dissents in part. (Opinion filed.) |
| NOT PARTICIPATING: | |

| | |
|---|---|
| ATTORNEYS: | |

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2011AP2758-D

STATE OF WISCONSIN : IN SUPREME COURT

**In the Matter of Disciplinary Proceedings Against Kenneth R. Kratz, Attorney at Law:**

**Office of Lawyer Regulation,**

      **Complainant,**

  **v.**

**Kenneth R. Kratz,**

      **Respondent.**

**FILED**

**JUN 6, 2014**

Diane M. Fremgen
Clerk of Supreme Court

ATTORNEY disciplinary proceeding. *Attorney's license suspended.*

¶1 PER CURIAM. We review the report of the referee, Reserve Judge Robert E. Kinney, recommending the court suspend Attorney Kenneth R. Kratz's license to practice law for a period of four months. No appeal has been filed.

¶2 We approve and adopt the referee's findings of fact and conclusions of law. We conclude that the seriousness of Attorney Kratz's misconduct warrants a four-month license suspension. We require that Attorney Kratz pay the full costs

of the proceeding, which totaled $23,904.10 as of August 20, 2012.

¶3 Attorney Kratz has been licensed to practice law in Wisconsin since 1985. He was appointed District Attorney of Calumet County, Wisconsin, in 1992 and served in that position until he resigned in October 2010. Before serving as the Calumet County District Attorney, Attorney Kratz served as an Assistant District Attorney in La Crosse, Wisconsin.

¶4 Attorney Kratz has no previous disciplinary history.

¶5 The disciplinary complaint before us, filed by the Office of Lawyer Regulation (OLR) on November 30, 2011,[1] involves allegations that Attorney Kratz sent inappropriate text messages to a domestic abuse crime victim, S.V.G., while serving as the prosecutor of the perpetrator of the domestic abuse crime. The complaint further alleges that Attorney Kratz made inappropriate verbal statements to two social workers with the Calumet County Human Services Department, S.S. and R.H. This course of behavior served as the basis of six counts of misconduct, to which Attorney Kratz has pled no contest.

¶6 The OLR's complaint included an additional five counts of misconduct. One of those counts concerned Attorney Kratz's text messages to S.V.G.; the remaining four counts alleged that Attorney Kratz engaged in inappropriate behavior toward two additional women, J.W. and M.R. The OLR moved for, and the

---

[1] Because the OLR filed its complaint prior to January 1, 2012, all references will be to the Supreme Court Rules in effect prior to January 1, 2012.

referee granted, the dismissal of three of these five counts on June 14, 2012, a few days before the start of the disciplinary hearing on June 19, 2012. The OLR moved for, and the referee granted, the dismissal of the other two counts at the outset of the disciplinary hearing. Attorney Kratz entered no contest pleas to the remaining six counts.

¶7 Of the six counts of misconduct to which Attorney Kratz pled no contest, three counts concern S.V.G. According to the OLR's complaint, on August 12, 2009, Attorney Kratz, while serving as Calumet County District Attorney, filed a felony criminal complaint against S.R.K. of Kaukauna, Wisconsin. According to the complaint, S.R.K. beat and strangled S.V.G., a former live-in partner and mother of S.R.K.'s child. The complaint charged one felony count of strangulation and suffocation (pursuant to Wis. Stat. § 940.235(1)) and one count of disorderly conduct (pursuant to Wis. Stat. § 947.01).

¶8 Shortly after the preliminary hearing in this matter, S.V.G. met with Attorney Kratz alone in a conference room at the district attorney's office. S.V.G. requested the meeting, exercising her right to consult with the district attorney "concerning the disposition of a case involving a crime of which he or she was a victim . . . ." See Wis. Stat. § 950.04(1v)(zm) (2009-10).

¶9 During the meeting, S.V.G. volunteered personal information to Attorney Kratz, stating that she did not have a current boyfriend, that she suffered from low self-esteem, that

3

she lived with her mother, and that she was struggling as a single mother.

¶10 According to S.V.G., she understood during her meeting with Attorney Kratz that he would be prosecuting S.R.K. S.V.G. also relayed details of her relationship with S.R.K., and indicated that S.R.K. had previously abused her, including beatings and strangulation. Attorney Kratz asked S.V.G. if she objected to reducing the felony charge to a misdemeanor. S.V.G. objected to the suggestion. At the conclusion of the meeting, Attorney Kratz and S.V.G. exchanged cell phone numbers.

¶11 After S.V.G. left Attorney Kratz's office, Attorney Kratz began texting S.V.G. from his personal cell phone. Attorney Kratz sent her three messages on October 20, 2009, the same day they met, his last message stating, "I wish you weren't one of this office[']s clients. You'd be a cool person to know!"

¶12 On October 21, 2009, Attorney Kratz sent S.V.G. 19 messages, including asking her: "Are you the kind of girl that likes secret contact with an older married elected DA . . . the riskier the better? Or do you want to stop right know [sic] before any issues?"

¶13 On October 22, 2009, Attorney Kratz sent S.V.G. eight more messages, telling her that she was "beautiful," "pretty," that "I'm the atty. I have the $350,000 house. I have the 6 figure career. You may be the tall, young, hot nymph, but I am the prize! Start convincing," and that "I would not expect you

to be the other woman. I would want you to be so hot and treat me so well that you'd be THE woman. R U that good?"

¶14 According to S.V.G., Attorney Kratz's personal overtures were unwelcome and offensive, and she was concerned that if she failed to respond to Attorney Kratz, he might take action with respect to the case against S.R.K. that could potentially adversely affect S.V.G.

¶15 On October 22, 2009, S.V.G. reported Attorney Kratz's text messages to the Kaukauna Police Department.

¶16 After photographing the text messages on S.V.G.'s telephone and taking S.V.G.'s statement, the Kaukauna Police Department referred the matter to the State of Wisconsin Department of Justice (DOJ).

¶17 After reviewing the text messages and the report of the Kaukauna Police Department, the DOJ determined that there had not been any criminal activity. Nonetheless, DOJ representatives strongly suggested to Attorney Kratz that he step aside from the prosecution of S.R.K. and self-report his conduct to the OLR.

¶18 Attorney Kratz facilitated the appointment of a special prosecutor to take over the S.R.K. case. Attorney Kratz also agreed to resign as chairman of the Wisconsin Crime Victims' Rights Board.

¶19 In a December 4, 2009 letter to the OLR that included the transcribed messages to and from S.V.G., Attorney Kratz admitted that he sought a personal "friendship" with S.V.G. He expressed regret and embarrassment for his conduct and admitted

that he had violated S.V.G.'s trust. Attorney Kratz also noted that he was undergoing therapy "to answer why a career prosecutor, with a spotless record and sterling reputation, would risk his professional esteem on such a disrespectful communication with a crime victim."

¶20 On September 15, 2010, the Associated Press published a story regarding Attorney Kratz's text messages to S.V.G. Attorney Kratz issued a statement admitting that he sent the texts and was embarrassed at his lack of judgment.

¶21 On September 17, 2010, the executive committee of the Wisconsin District Attorneys Association issued a letter to Attorney Kratz calling for his resignation.

¶22 After then-Governor James Doyle initiated removal proceedings against him pursuant to Chapter 17 of the Wisconsin Statutes, Attorney Kratz resigned his position as Calumet County District Attorney on October 4, 2010.

¶23 Two counts of the OLR's complaint involve Attorney Kratz's verbal statements to S.S., a social worker with the Calumet County Human Services Department.

¶24 In October of 2009, Attorney Kratz prosecuted a termination of parental rights case in which S.S. was a witness. Prior to testifying, S.S. commented to Attorney Kratz that she was nervous about testifying. In response to S.S.'s concerns, Attorney Kratz stated to S.S. that he "won't cum in your mouth." Later that day Attorney Kratz remarked to S.S. that he wanted the trial to be over because he was leaving on a trip to

6

Las Vegas, where he could have "big boobed women serve me drinks."

¶25 One count of the OLR's complaint involves Attorney Kratz's verbal statement to R.H., also a social worker with the Calumet County Human Services Department. During a court proceeding, Attorney Kratz commented in court to R.H. that a reporter had "big beautiful breasts."

¶26 On the first day of the scheduled disciplinary hearing in this matter, Attorney Kratz entered pleas of no contest to six counts of misconduct stemming from his behavior toward S.V.G., S.S., and R.H. The referee found that an adequate factual basis existed on each of the six counts, and accepted the no contest pleas.

¶27 The referee concluded that, by seeking a personal relationship with S.V.G., a domestic abuse crime victim and witness, while serving as the prosecutor of the perpetrator of the domestic abuse crime, thereby creating a significant risk that the representation of the State of Wisconsin would be materially limited by his own personal interests, Attorney Kratz engaged in a concurrent conflict of interest in violation of SCR 20:1.7(a).[2]

---

[2] SCR 20:1.7(a) states:

Except as provided in par. (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

¶28 The referee also concluded that, by seeking a personal relationship with S.V.G., a domestic abuse crime victim and witness, and by sending her text messages carrying sexual overtones, while prosecuting the perpetrator of the domestic abuse crime, Attorney Kratz engaged in offensive personality, in violation of SCR 20:8.4(g)[3] and SCR 40.15.[4]

¶29 The referee also concluded that, by sending deliberate, unwelcome, and unsolicited sexually suggestive text messages to S.V.G., a domestic abuse crime victim and witness, while prosecuting the perpetrator of the domestic abuse crime,

---

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

[3] SCR 20:8.4(g) states it is professional misconduct for a lawyer to "violate the attorney's oath; . . . ."

[4] SCR 40.15, "Attorney's oath," states, in pertinent part:

The oath or affirmation to be taken to qualify for admission to the practice of law shall be in substantially the following form:

. . . .

I will abstain from all offensive personality and advance no fact prejudicial to the honor or reputation of a party or witness, unless required by the justice of the cause with which I am charged; . . . .

Attorney Kratz harassed S.V.G. on the basis of her sex, in violation of SCR 20:8.4(i).[5]

¶30 The referee also concluded that, by stating to S.S., a Calumet County social worker and witness in a termination of parental rights case, that he "won't cum in your mouth" and that he wished the trial to be over because he was traveling to Las Vegas where he could have "big boobed women serve me drinks," and by making these comments while acting in his capacity as Calumet County District Attorney, Attorney Kratz engaged in offensive personality in violation of SCR 20:8.4(g) and SCR 40.15.

¶31 The referee also concluded that, by stating to S.S., a Calumet County social worker and witness in a termination of parental rights case, that he "won't cum in your mouth" and that he wished the trial to be over because he was traveling to Las Vegas where he could have "big boobed women serve me drinks," and by making these comments while acting in his capacity as Calumet County District Attorney, Attorney Kratz harassed S.S. on the basis of her sex, in violation of SCR 20:8.4(i).

¶32 Finally, the referee concluded that, by making a comment during a court proceeding to R.H., a Calumet County

---

[5] SCR 20:8.4(i) states it is professional misconduct for a lawyer to "harass a person on the basis of sex, race, age, creed, religion, color, national origin, disability, sexual preference or marital status in connection with the lawyer's professional activities.  Legitimate advocacy respecting the foregoing factors does not violate par. (i)."

social worker, that a reporter had "big beautiful breasts," and by making this comment while acting in his capacity as Calumet County District Attorney, Attorney Kratz engaged in offensive personality, in violation of SCR 20:8.4(g) and SCR 40.15.

¶33 At the June 19, 2012 disciplinary hearing, the referee heard testimony and received exhibits on the issue of the appropriate discipline. The referee also received post-hearing briefing on the subject.

¶34 In its post-hearing brief, the OLR argued that Attorney Kratz's license should be suspended for six months. The OLR emphasized that Attorney Kratz's conduct involved multiple women, all of them in vulnerable or subordinate positions. The OLR argued that Attorney Kratz did not intend to remove himself as prosecutor in the S.V.G. matter until DOJ officials asked him to do so after S.V.G. reported his actions to the police. The OLR also argued that Attorney Kratz refused to take responsibility for his offensive statements to S.S. and R.H. The OLR further argued that because Attorney Kratz blamed his misconduct on various addictions yet offered no competent medical testimony that he had recovered from his addictions, a six-month suspension would be appropriate given that it would require him to petition the court for reinstatement under SCR 22.28(3).[6]

---

[6] SCR 22.28(3) states, "The license of an attorney that is revoked or suspended for misconduct for six months or more shall be reinstated pursuant to the procedure set forth in SCR 22.29 to 22.33 and only by order of the supreme court."

¶35 In his post-hearing brief, Attorney Kratz argued that a public reprimand was warranted. In support of his argument that a license suspension was not warranted, Attorney Kratz downplayed the seriousness of his misconduct toward S.V.G., S.S., and R.H.

¶36 Regarding his texts to S.V.G., Attorney Kratz admitted they constituted wrongful behavior, but "disagree[d] with the OLR's characterization that the messages contained 'sexual overtones' (as no message included one single sexually explicit term, nor was any sexual conduct or sex act ever suggested)." Attorney Kratz also described his conduct upon learning that S.V.G. objected to his texts as praiseworthy. He wrote:

> [U]pon even the <u>hint</u> of a conflict of interest, or reports of unsettling reaction by [S.V.G.], immediate steps were taken to eliminate even the perception of continued violation; timely self-report to the OLR for imposition of sanction (if required); and aggressive steps to ensure this stupidity never, ever repeated itself. That is the attorney response that this Court should praise, rather than punish.

¶37 Regarding his verbal comments to social worker S.S. that he "won't cum in [her] mouth" and looked forward to having "big boobed women serve [him] drinks," Attorney Kratz wrote that he "recognized the disrespectful phrase used, and apologized to the Social Worker at the first opportunity."

¶38 Regarding his statement to social worker R.H. that a "reporter"[7] had "big beautiful breasts," Attorney Kratz wrote in his post-hearing brief that this comment "never occurred." Attorney Kratz argued that "the reporter referred to, although admittedly beautiful, does NOT have large breasts . . . this single important factor has been relied upon by Respondent to conclude the comment never was made, or at the very least, [was] misinterpreted by [R.H.]." Attorney Kratz conceded, however, that "given the posture of this case, the tribunal is free to include the facts of the [R.H.] comment, and provide it such weight in the sanctions recommendations as deemed necessary."

¶39 As a mitigating factor, Attorney Kratz wrote in his post-hearing brief that at the time of the events in question, he "suffered from the combination of Sexually Compulsive Disorder (SCD) and prescription drug dependence"——conditions for which he has sought treatment. He also claimed that he wanted "to settle the case" early in the disciplinary process, but the OLR refused to do so, in part because it is "apparently more concerned with how 'they look' in the zealous pursuit of an attorney 'pelt,' rather than what result 'should' be reached."

---

[7] What kind of "reporter" Attorney Kratz was referencing was the source of some confusion in the proceedings before the referee. In its complaint, the OLR referred to the reporter as a "court reporter." Three weeks before the disciplinary hearing, the OLR moved to amend its complaint to refer to "a reporter," as opposed to a "court reporter." The referee granted the OLR's motion to amend. In his post-hearing brief, Attorney Kratz described the reporter in question as a "TV reporter."

12

¶40 On July 30, 2012, the referee filed a report and recommendation. In considering the appropriate discipline, the referee weighed various aggravating and mitigating factors.

¶41 The referee noted as aggravating factors that Attorney Kratz acted with a selfish motive; that S.V.G. was a vulnerable victim; and that Attorney Kratz's misconduct was particularly inexcusable in light of his considerable legal experience and his previous leadership on issues pertaining to victims' rights.

¶42 The referee assigned neutral weight to Attorney Kratz's self-report to the OLR of his misconduct involving S.V.G. The referee wrote that "at the time of the respondent's self-report, the cat was already out of the bag, so to speak. S.V.G. had gone to the police, the police had contacted the Wisconsin Department of Justice, and that agency urged the respondent to self-report to the OLR." The referee found that these circumstances "significantly undercut any claim of virtuousness by self-reporting."

¶43 The referee noted a variety of mitigating factors, which, in summary fashion, are as follows: Attorney Kratz has no prior disciplinary history; he apologized to S.S. for his vulgar comment shortly after making it; he has never attempted to justify or defend his conduct toward S.V.G.; he cooperated with the disciplinary proceedings; he previously enjoyed a good professional reputation and engaged in significant volunteer activities within the legal profession; he has been diagnosed with and sought treatment for narcissistic personality disorder

13

and sexual addiction; he was abusing the sleeping aid Ambien, the painkiller Vicodin, and the anti-anxiety drug Xanax at the time of the misconduct; he subsequently sought treatment for his substance abuse issues; he voluntarily obtained a mentor attorney through the State Bar's Wisconsin Lawyer Assistance Program (WisLAP), who reported being impressed with Attorney Kratz's character and commitment to recovery; and he had suffered substantial collateral consequences from his misconduct, including considerable negative publicity, the loss of his district attorney position, and significant financial difficulties.

¶44 After weighing these aggravating and mitigating factors, the referee recommended that Attorney Kratz's license to practice law should be suspended for a period of four months. In support of his recommendation for a lighter sanction than that proposed by the OLR, the referee emphasized the number and weight of the mitigating factors in this case. The referee also suggested that a four-month suspension was consistent with the discipline imposed in two cases that he believed were particularly analogous to this case. In re Disciplinary Proceedings Against Beatse, 2006 WI 115, 297 Wis. 2d 292, 722 N.W.2d 385 (assistant district attorney publicly reprimanded for having spent numerous hours viewing pornography on his work computer, lied about the source of the pornography and the extent of his viewing, used the state's e-mail system to send and receive sexually explicit e-mail messages, and made inappropriate comments to a county employee in a work

14

environment); In re Disciplinary Proceedings Against Ridgeway, 158 Wis. 2d 452, 462 N.W.2d 671 (1990) (assistant state public defender suspended for six months for having initiated and engaged in sexual contact with a client he was representing as a public defender, and for having encouraged that client to violate the terms of her probation by providing her with alcoholic beverages).

¶45 No appeal has been filed, so this matter is submitted to the court pursuant to SCR 22.17(2).[8] We affirm a referee's findings of fact unless they are found to be clearly erroneous. In re Disciplinary Proceedings Against Inglimo, 2007 WI 126, ¶5, 305 Wis. 2d 2d 71, 740 N.W.2d 125. We review the referee's conclusions of law on a de novo basis. Id. We determine the appropriate level of discipline given the particular facts of each case, independent of the referee's recommendation, but benefiting from it. In re Disciplinary Proceedings Against Widule, 2003 WI 34, ¶44, 261 Wis. 2d 45, 660 N.W.2d 686.

¶46 After reviewing the record, we conclude that the referee's factual findings are supported by the record, and we adopt them. We also adopt the referee's conclusion that

---

[8] SCR 22.17(2) states as follows:

   If no appeal is filed timely, the supreme court shall review the referee's report; adopt, reject or modify the referee's findings and conclusions or remand the matter to the referee for additional findings; and determine and impose appropriate discipline. The court, on its own motion, may order the parties to file briefs in the matter.

Attorney Kratz committed the six counts of misconduct described above.

¶47 With respect to the appropriate level of discipline, we agree with the referee that a four-month suspension is necessary discipline for Attorney Kratz's misconduct in this matter. Attorney Kratz's conduct toward S.V.G. was appalling. Through a series of wheedling text messages, Attorney Kratz attempted to convince S.V.G., a domestic abuse crime victim and witness, to enter into a sexual relationship with him while he was prosecuting the perpetrator of the domestic crime. S.V.G. felt leveraged by Attorney Kratz's sexual entreaties; she feared that if she failed to respond to him, he might take action in her domestic abuse case that could potentially adversely affect her. This was exploitative behavior, harassing behavior, and a crass placement of his personal interests above those of his client, the State of Wisconsin. Attorney Kratz's comments to social worker S.S. while she served as a witness in one of his cases——that he "won't cum in [her] mouth" and looked forward to "big boobed women" serving him drinks in Las Vegas——crossed the line separating the unprofessional from the acutely offensive and harassing. Attorney Kratz's statement to social worker R.H. during a court proceeding, in which he voiced approval of a reporter's "big beautiful breasts," was sufficiently boorish as to constitute misconduct. In short, whatever his qualities and accomplishments as a lawyer, Attorney Kratz proved himself during the period in question to be sanctionably sophomoric.

16

¶48 Attorney Kratz has rationalized his poor behavior by confessing to various addictions: to Ambien, to Vicodin, to Xanax, and to sex, though he fails to point to either medical records or expert medical testimony that would explain the exact nature and severity of his conditions, or how they may have affected his ability to conform his behavior to ethical rules. But regardless of how we view Attorney Kratz's behavior——as an involuntary byproduct of addiction, or as a willful blindness to professional standards——the ugly picture painted by the record remains the same. The recommended four-month suspension is deserved.[9]

¶49 We turn next to the issue of costs. The OLR filed its statement of costs on August 20, 2012, listing $23,904.10 in costs. Supreme Court Rule 22.24(2) required Attorney Kratz to file any objection to the OLR's statement of costs within 21 days after service——or on or about September 10, 2012. On November 14, 2012——over two months past the deadline—— Attorney Kratz filed an objection to the statement of costs, along with a motion asking the court to accept his late filing.

---

[9] We note that the referee additionally recommended that Attorney Kratz's license to practice law in this state should be conditioned on his continued participation in a WisLAP monitoring program. We further note that in April 2014, the WisLAP coordinator wrote to advise the court that Attorney Kratz had successfully completed a two-year voluntary monitoring contract with WisLAP. In light of Attorney Kratz's successful completion of his WisLAP monitoring contract, we decline to order continued WisLAP monitoring.

Attorney Kratz offered no explanation for the lateness of his filing.

¶50 We reject Attorney Kratz's unexcused late filing. Our deadlines are not mere suggestions. Filing documents with this court over two months late with no semblance of a reasonable excuse has its consequences. As the Seventh Circuit has explained:

> We live in a world of deadlines. If we're late for the start of the game or the movie, or late for the departure of the plane or the train, things go forward without us. The practice of law is no exception. A good judge sets deadlines, and the judge has a right to assume that deadlines will be honored.

Spears v. City of Indianapolis, 74 F.3d 153, 157 (7th Cir. 1996).

¶51 Even if we were to consider Attorney Kratz's objection to costs on its merits, it falls well short of convincing us to impose anything other than full costs. If anything, Attorney Kratz's untimely objection to costs hurts more than it helps his cause.

¶52 In his untimely objection, Attorney Kratz insists that he should pay no costs whatsoever. The OLR asks us to impose full costs consistent with our standard practice under SCR 22.24(1m).[10]

---

[10] SCR 22.24(1m)(effective from July 1, 2006 to December 31, 2011) provides:

> The court's general policy is that upon a finding of misconduct it is appropriate to impose all costs, including the expenses of counsel for the office of lawyer regulation, upon the respondent. In cases involving extraordinary circumstances the court may,

18

¶53 The referee has recommended an equal split of the costs. In his report, the referee stated that although the court's general policy is to impose all costs against a respondent upon a finding of misconduct, "[o]ne of the relevant factors set forth in SCR 22.24(1m) warrants deviation from the standard rule." That factor, according to the referee, is SCR 22.24(1m)(a): "[t]he number of counts charged, contested, and proven." The referee noted that the OLR spent "more than the usual time and effort" in locating and arranging for the testimony of the two grievants, J.W. and M.R., whose claims formed the basis for four misconduct counts that the OLR dismissed at or shortly before the start of the scheduled disciplinary hearing. The referee explained that although it is "not at all unusual" for the OLR to dismiss claims during the

---

in the exercise of its discretion, reduce the amount of costs imposed upon a respondent. In exercising its discretion regarding the assessment of costs, the court will consider the submissions of the parties and all of the following factors:

(a) The number of counts charged, contested, and proven.

(b) The nature of the misconduct.

(c) The level of discipline sought by the parties and recommended by the referee.

(d) The respondent's cooperation with the disciplinary process.

(e) Prior discipline, if any.

(f) Other relevant circumstances.

19

course of a disciplinary proceeding, it "would seem unfair . . . to impose all the costs on the respondent."

¶54 We disagree with both the referee and Attorney Kratz and impose full costs. Under SCR 22.24, the court has the exclusive authority to decide the appropriate assessment of costs against a disciplined lawyer. We note that at the time the referee filed his report recommending halving the costs normally assessable against Attorney Kratz, the referee was operating at an informational disadvantage. Consistent with SCR 22.24(2), the OLR filed its statement of costs and an itemization of costs several weeks after the referee filed his report.

¶55 Reviewing the costs issue de novo, we disagree with the referee's recommendation that the costs assessed against Attorney Kratz should be essentially proportional to the percentage of counts on which the OLR prevailed. It is true, as the referee emphasized, that SCR 22.24(1m)(a) lists as a factor to consider in reducing costs the "number of counts charged, contested, and proven." Our rules, however, require that to impose less than full costs on the lawyer disciplined, the court must first find "extraordinary circumstances." SCR 22.24(1m). Only if and when the court finds that "extraordinary circumstances" exist in a particular case may the court consult the factors listed in SCR 22.24(1m)(a) through (f) to guide the court's imposition of costs.

¶56 We do not find extraordinary circumstances present here. To begin with, it is not extraordinary for the OLR to

prosecute all misconduct counts for which the Preliminary Review Committee found cause to proceed. And, in the words of the referee, it is "not at all unusual" for the OLR to dismiss claims during the course of a disciplinary proceeding, as was the case with the five misconduct counts dismissed here.[11] As for who should pay the cost of litigating dismissed misconduct charges——the disciplined lawyer or the other attorneys in this state——this court has chosen the former, barring "extraordinary circumstances" which, by definition, we do not normally find. See SCR 22.24(1m); see also In re Disciplinary Proceedings Against Pangman, 216 Wis. 2d 440, 460-61, 574 N.W.2d 232 (1998) (rejecting objections to full assessments of costs based on an apportionment of the number of misconduct allegations established); In re Disciplinary Proceedings Against Johnson, 165 Wis. 2d 14, 20, 477 N.W.2d 54 (1991) (same).

¶57 We also find nothing extraordinary about Attorney Kratz's claim, stridently advanced in his untimely objection to costs, that he was willing to conditionally admit some of the misconduct charges several months before the scheduled disciplinary hearing. We reject the premise of Attorney Kratz's argument: that he has been dragged through an

---

[11] We note that as an appellate court, we know only what the record contains, and we do not know precisely why the OLR dismissed the counts that it did. Nor should we: this court's function is not to armchair quarterback the OLR's litigation decisions, but to review the record and determine whether the referee properly concluded that the respondent violated the ethics code by engaging in misconduct.

expensive disciplinary process while furiously waving the white flag of surrender from the very beginning. This simply is not true.

¶58 The primary basis for Attorney Kratz's claim that these disciplinary proceedings were unnecessary is a single e-mail, dated about two weeks after the OLR filed its complaint, from Attorney Kratz to the OLR's counsel. In this e-mail, Attorney Kratz stated his willingness to enter no contest pleas to some, but not all, of the counts to which he ultimately pled no contest. He offered to enter no contest pleas to the three counts involving S.V.G. to which he ultimately pled no contest. He denied misconduct toward R.H. He stated he had "no recollection" of making the vulgar remarks to S.S. and would "prefer not to admit to something I do not recall," and he denied that any "one-time crude remarks" could constitute harassment under SCR 20:8.4(i). He stated that "[t]his count"——presumably, the offensive personality count under SCR 20:8.4(g) and SCR 40.15 concerning S.S.——"could result in a 'no contest' plea if you want a 2nd 'incident' to hang your hat on, other than [S.V.G.]" He stated that although he would accept a six-month suspension, he wanted the suspension to take effect less than three weeks later, and to be given "credit" against his suspension for an over five-month period during which he had "removed [himself] from the practice of law." We note that with his request for an over five-month credit against his proposed six-month suspension, Attorney Kratz was proposing that he receive a net suspension of about three weeks. Attorney Kratz

22

explained that he intended to move out of state, and his "opportunity to be licensed elsewhere requires my reinstatement here."

¶59 In its reply to Attorney Kratz's untimely objection to costs, the OLR informs us that it chose not to accept the terms stated in Attorney Kratz's e-mail. The OLR states that it did not agree with Attorney Kratz's suggestion that the time he allegedly refrained from practicing law should be "credited" against any imposed suspension. The OLR also did not agree to starting the suspension period less than three weeks after the date of the e-mail. The OLR further informs us that it reminded Attorney Kratz that this court prohibits parties in OLR cases from engaging in plea bargaining. See, e.g., Inglimo, 305 Wis. 2d 71, ¶85. Finally, the OLR tells us that at the time of Attorney Kratz's e-mail, the OLR director "reconsidered the viability of each misconduct count and determined it would be inappropriate to drop the counts suggested by Attorney Kratz."

¶60 We decline to equate Attorney Kratz's highly optimistic settlement offer with an extraordinary circumstance sufficient to justify a reduction in costs. Although we have long allowed lawyers and the OLR to enter into stipulations of fact and law and jointly request the imposition of a justifiable level of discipline, we refuse Attorney Kratz's invitation to undertake the task of evaluating the parties' efforts to reach such a stipulation; i.e., to review the history of the parties' case discussions in order to determine who was willing to stipulate to what, when, and at what consequence; whether a

23

stipulated outcome was reasonably achievable; and how much the SCR 22.24 costs totaled at the relevant point(s) in time.

¶61 This is not to say that it is impossible for an attorney to limit, or even eliminate, the imposition of costs under SCR 22.24. An attorney may entirely avoid paying the costs of a proceeding by entering into a comprehensive, court-approved stipulation prior to the appointment of a referee. See, e.g., In re Disciplinary Proceedings Against Compton, 2010 WI 112, ¶13, 329 Wis. 2d 318, 787 N.W.2d 831 (citing SCR 22.12). This was not done here. After the appointment of a referee, an attorney may stop the running of SCR 22.24 costs by entering into a stipulation that eliminates the need for further litigation. This was not done here.

¶62 What was done here, according to the record, is that Attorney Kratz e-mailed a stipulation proposal written in self-interested terms, and the OLR rejected it. This is not an "exceptional circumstance": to modify a familiar refrain, you can't always get what you want, or what you need.

¶63 We do not find the costs incurred extraordinary either. The costs consist of about $15,000 in fees and disbursements from the OLR's counsel; about $5,700 in referee's fees and mileage expenses; and about $2,900 in court reporting and other costs. Attorney Kratz does not argue that these costs were in any way inflated. He does not challenge the billable rates of the OLR's counsel or the referee, or the time spent by either on any particular task. He does not challenge any disbursements or expenses as excessively high. He does not do

what SCR 22.24(2) instructs: "explain, with specificity, the reasons for the objection [to costs] and . . . state what he . . . considers to be a reasonable amount of costs."

¶64 In place of specificity Attorney Kratz resorts to hyperbole. He writes in his tardy objection to costs:

> As this Court should by now have undeniably determined, there is nothing ORDINARY about this disciplinary case brought by the OLR against the Respondent, and the assessment of ANY costs against the Respondent, as a result of the OLR's insistence on a formal hearing, is unjust and borders on the intellectually insulting.
>
> [I]t was the Respondent himself who has done everything, since well before any formal grievance was filed with the OLR, to resolve this entire matter with professional humility, having immediately and consistently taken full responsibility for any possible Supreme Court Rule violation . . . .

¶65 The record proves otherwise. In every stage of these proceedings, Attorney Kratz has employed a tooth-and-nail litigation approach. He denied all misconduct in his answer to the OLR's complaint and raised various constitutional, jurisdictional, and procedural defenses. He accused the OLR of operating under a conflict of interest and of unethically leaking information. He moved to dismiss the OLR's complaint on nine separate grounds; the referee later rejected the motion as "replete with bare assertions of fact" which were "not properly before the referee and may not be considered." He engaged in vigorous discovery practice, including propounding over 125 interrogatories, filing discovery motions, and attempting to compel the production of documents from third parties. He

25

raised arguments that ranged from the incredible (e.g., disputing his text messages to S.V.G. contained sexual overtones); to the hyper-technical (claiming the OLR complaint was barred by the civil doctrines of issue and claim preclusion because an OLR investigator initially declined to forward S.V.G.'s grievance for formal investigation); to the inconsistent (denying any recollection of making inappropriate comments to S.S. but claiming credit for having recognized their inappropriateness and apologized); to the puzzling (arguing that he could not have told R.H. that a reporter had "big beautiful breasts" because the reporter in question was beautiful, but not large breasted).

¶66 It was, of course, Attorney Kratz's right to vigorously contest the misconduct charges. But SCR 22.24(1m) makes clear that when a lawyer whom this court ultimately finds guilty of misconduct imposes costs on the disciplinary system, he or she must expect to pay. And litigation, as every litigant knows, is not cheap. We refuse to transfer the litigation costs that Attorney Kratz has generated to the other attorneys of the state who are innocent of any wrongdoing.

¶67 In the end, there is nothing "extraordinary" here from a costs perspective. Our general rule is to impose full costs upon a finding of misconduct, and we do so here. See SCR 22.24(1m).

¶68 IT IS ORDERED that the license of Kenneth R. Kratz to practice law in Wisconsin is suspended for a period of four months, effective July 11, 2014.

26

¶69 IT IS FURTHER ORDERED that Kenneth R. Kratz shall comply with the provisions of SCR 22.26 concerning the duties of a person whose license to practice law in Wisconsin has been suspended.

¶70 IT IS FURTHER ORDERED that within 60 days of the date of this order, Kenneth R. Kratz shall pay to the Office of Lawyer Regulation the costs of this proceeding.

¶71 IT IS FURTHER ORDERED that compliance with all conditions of this order is required for reinstatement. See SCR 22.28(2).

¶72 SHIRLEY S. ABRAHAMSON, C.J. *(concurring).* I join the per curiam opinion.

¶73 The OLR disciplinary system is about 15 years old. Several anomalies and proposed amendments have been brought to the court's attention. It is time for the court to institute a review of the system rather than to make piecemeal adjustments at this time. See my writings in OLR v. Johns, 2014 WI 32, ___ Wis. 2d ___, ___ N.W.2d ___; OLR v. Osicka, 2014 WI 33, ___ Wis. 2d ___, ___ N.W.2d ___; and OLR v. Osicka, 2014 WI 34, ___ Wis. 2d ___, ___ N.W.2d ___; of even date.

¶74 I welcome Justice Prosser's support for an impartial, objective, thorough review of OLR practices and procedures, support he gave at the open rules petition conference in October 2013. For a history of a proposal for such a review, listen to the open rules petition conference of October 25, 2013, in connection with proposals for change in OLR's practices.

¶75 The question of instituting such a review will come before the court again. I hope it will get four votes.

1

¶76 DAVID T. PROSSER, J. *(concurring in part, dissenting in part).* From time to time every government agency would benefit from an impartial, objective review of the agency's practices and procedures. There is increasing evidence of the need for such an evaluation of the Office of Lawyer Regulation (OLR). This case highlights some of the problems facing the agency and why an objective review would be desirable.

I

¶77 It must be stated at the outset that the misconduct of Attorney Kenneth Kratz requires discipline. I concur in the recommendation of the referee that Attorney Kratz receive a four-month suspension, which is the suspension approved by the court.

¶78 OLR wanted a six-month suspension. A six-month suspension would require Attorney Kratz to seek readmission from this court, a process that often takes the better part of a year. A suspension of that duration would have been unreasonable.

¶79 OLR also asked that Attorney Kratz pay all costs of the proceeding, namely, $23,904.10, and the court approves these costs, contrary to the recommendation of the referee. The exorbitant costs requested by OLR——and granted by this court—— require discussion and prompt this partial dissent.

II

¶80 OLR charged Attorney Kratz with 11 counts of misconduct. The first four counts involved S.V.G. One of these counts was later dismissed by OLR. The counts involving S.V.G.

1

are the reason why Attorney Kratz requires discipline. They are described in ¶¶7-22 of the Per Curiam opinion.

¶81 Attorney Kratz's conduct was highly inappropriate and cannot be defended. What is important for this concurrence/dissent, however, is that the substance of these counts, including all text messages between Attorney Kratz and S.V.G., were self-reported by Kratz to OLR on December 4, 2009, making proof of ethical violations easy to accomplish. Thus, one of the first issues to examine is why OLR did not file any charges against Attorney Kratz until November 30, 2011.

¶82 It seems obvious, in retrospect, that Attorney Kratz suffered a serious breakdown of some sort by October 2009.[1] He had been through considerable stress from 2005 through 2009 as

---

[1] The referee in this case, former Oneida County Circuit Judge Robert E. Kinney, wrote the following in his "Report and Recommendation" to the court:

> Perhaps the most perplexing aspect of this case is the seeming incongruity between some of the respondent's professional accomplishments and the inexplicable behavior which he engaged in which brings him before the Court now. . . .

> The respondent was appointed special prosecutor in the case of State v. Steven Avery. This was a high-profile case with state-wide media coverage. . . . During this time period, the respondent testified he had trouble sleeping and was prescribed the drug Ambien. . . . Shortly thereafter, people observed a change in his behavior. . . . [T]he respondent testified that he had been prescribed Xanax for anxiety attacks, and was taking left-over Vicodin which had been prescribed earlier after he underwent surgery. The respondent testified that he developed a dependency on Ambien and Xanax. He testified that he believes the use of these drugs diminished his inhibitions and caused his speech to be more unfiltered.

special prosecutor in the high profile murder trials of Steven Avery and Brendan Dassey in Manitowoc County. Post-conviction proceedings in Dassey's case were still pending in the fall of 2009, culminating in a five-day hearing in 2010. Attorney Kratz and his then-wife separated in October 2009, during this stressful period, and he began to abuse prescription drugs. Whether these stresses and difficulties contributed to Attorney Kratz's October conduct is speculative, but the stresses and difficulties are not speculative.

¶83 Counts 1, 3, 4, 5, and 6 are based on incidents that occurred during October 2009. No date is given for the incident in Count 7.

¶84 Attorney Kratz's unacceptable text messages with respect to S.V.G. took place over a period of three days in October 2009, approximately a week after separation from his wife. On the third day S.V.G. took the matter to local police. Within two weeks, Kratz had removed himself from the criminal case in which S.V.G. was the victim. After the Wisconsin Department of Justice (DOJ) was notified of Attorney Kratz's conduct, it pressured Attorney Kratz to resign as chair of the Wisconsin Crime Victims' Rights Board and to self-report his misconduct to OLR. He did the latter on December 4, 2009, admitting his misconduct and expressing his embarrassment for it.

¶85 When OLR received Attorney Kratz's communication, including all the text messages, it commenced an investigation. Thereafter, on February 4, 2010, OLR received a grievance from S.V.G. On February 18 an OLR investigator wrote to S.V.G.

3

asking that she contact the investigator. On March 5, having received no response from S.V.G., the investigator notified S.V.G. that the matter had been closed. Attorney Kratz was notified of this action. In sum, three months after it received all the information necessary to prosecute Attorney Kratz and barely a month after receiving the grievance from S.V.G., OLR closed the case.

¶86 The record does not indicate why S.V.G. did not follow up on her grievance. The record does not indicate why OLR closed the matter when it had ample evidence to proceed if it wished to do so. OLR's letter to S.V.G. stated that Attorney Kratz's conduct "did not appear to involve possible professional misconduct."

¶87 Six months later, Keith Sellen, director of the OLR, was contacted by Ryan Foley, a reporter for the Associated Press (AP). Sellen later indicated in an affidavit that he had not been aware of the Kratz matter before the Foley inquiry.

¶88 The following day, September 15, 2010, Foley wrote a news story based on information he obtained from a police report released by the Kaukauna Police Department. Foley did not reveal how he learned about the police report describing Attorney Kratz's conduct.

¶89 Foley's AP story triggered a political firestorm less than two months before the 2010 general election. There were immediate calls for Attorney Kratz's resignation as Calumet County District Attorney. When Attorney Kratz did not resign, Governor James Doyle initiated proceedings to remove him from office.

¶90 The <u>Kratz</u> matter became a political issue.[2] Scott Hassett, the Democratic candidate for attorney general, accused his opponent, incumbent Attorney General J.B. Van Hollen, of knowing about the Kratz matter for nearly a year and doing "nothing about it."[3] Democratic Party Chair Mike Tate accused Van Hollen of a "cover up" "after discovering the sexually-harassing text messages fellow Republican and political ally Ken Kratz sent to a woman whose boyfriend he was trying for nearly strangling her to death."[4]

¶91 Attorney General Van Hollen responded to these attacks with assertions that the DOJ pressured Kratz to resign from the Crime Victims Rights Board and advised him to self-report his conduct to OLR. "There are no bones about the fact that the Office of Lawyer Regulation dropped the ball here," Van Hollen told the <u>Post-Crescent</u> newspaper in Appleton.[5] He said he was surprised to learn that OLR had told S.V.G. that Attorney Kratz's conduct "did not appear to involve possible professional

---

[2] Jim Collar, <u>Fallout With Calumet County District Attorney Ken Kratz Takes On Political Tinge</u>, Appleton Post-Crescent, September 21, 2010.

[3] <u>Cf</u>. <u>Challenger Scott Hassett Says Attorney General J.B. Van Hollen Knew About District Attorney Sexting Case But Did Nothing About It</u>, Milwaukee Journal Sentinel, October 4, 2010 (citing Scott Hassett email to supporters); <u>see also</u> <u>Van Hollen, a pretty good AG?</u>, Isthmus, October 8, 2010 at 6.

[4] Press Release, Democratic Party of Wisconsin, <u>J.B. Van Hollen's Ken Kratz Coverup Continues</u>, (Sept. 21, 2010) (on file with author).

[5] Jim Collar, <u>Wisconsin Attorney General J.B. Van Hollen Criticizes Office of Lawyer Regulation For Its Handling of Case Involving Calumet County District Attorney Ken Kratz</u>, Appleton Post-Crescent, Sept. 22, 2010).

misconduct."  "I personally am very concerned with the fact that the Office of Lawyer Regulation determined that there was nothing wrong with this activity," he added.[6]

¶92 OLR, having now received a letter from S.V.G.'s attorney, Michael Fox, reopened the Kratz investigation. Additional complaints came in.  More than 13 months later, OLR filed its complaint.

III

¶93 From all appearances, OLR was determined to make up for "dropping the ball."  It selected as outside counsel Thomas Basting, who filed 11 charges against Attorney Kratz, including seven counts related to four new matters.  In one of these charges, OLR essentially accused Attorney Kratz of sexual assault:

> After various phone conversations, Kratz asked to visit JW at her apartment.  JW asserts that Kratz arrived at her apartment and after threatening JW, forced her to have sex. . . .
>
> On September 28, 2010, JW provided the information about Kratz to her probation officer at the Department of Corrections (DOC).  The DOC reported the issue to the DOJ.
>
> The DOJ interviewed JW who provided a statement. The statement JW provided alleges that Kratz, while District Attorney of Calumet County, had forcible sex with an emotionally vulnerable woman after previously prosecuting the woman.

---

[6] See interview by Dan Flannery, Executive Editor of Appleton Post-Crescent, with Wisconsin Attorney General J.B. Van Hollen at http://www.postcrescent.com/article/20100922/APC0101/9220673/Wisconsin-Attorney-General-J-B-Van-Hollen-criticizes-Office-Lawyer-Regulation-its-handling-case-involving-Calumet-County-District-Attorney-Ken-Kratz.

6

(Emphasis added.)

¶94 In filing this sensational charge pertaining to alleged sexual assault, OLR not only discredited Attorney Kratz but also implicitly criticized the DOJ and local law enforcement authorities for failing to prosecute him. It later quietly dismissed the charge.

¶95 As noted above, OLR also asked that Attorney Kratz be suspended from the practice of law for six months.

IV

¶96 Looking backward, OLR forced Attorney Kratz to defend his law license to avoid being required to apply for readmission to the bar, and to defend himself against alleged criminal conduct. Attorney Kratz admitted the S.V.G. counts but disputed that he should be suspended for six months because of them. In time OLR dropped FIVE counts, including the alleged sexual assault count. The only new charges on which OLR prevailed were three counts involving tasteless sexual comments that Attorney Kratz made to two co-workers. The co-worker in Counts 5 and 6 acknowledged that Attorney Kratz's comments were out of character and that Attorney Kratz apologized and told her his comments were inappropriate and he should not have made them. The co-worker in Count 7 also said Attorney Kratz's comment was out of character.

V

¶97 In the years following S.V.G.'s complaint to the Kaukauna police, Attorney Kratz was forced to resign as Calumet County District Attorney. He went through a divorce. He lost his home and his car. He was sued by S.V.G. in the United

7

States District Court and settled the lawsuit.[7] He filed for bankruptcy. It is unlikely that Attorney Kratz is in any position to pay $23,904.10 in court costs. These extravagant costs will pose a serious hardship to Attorney Kratz, cannot be justified on the basis of the OLR prosecution, and are manifestly unfair.

VI

¶98 The Kratz case underscores the need for a thorough review of OLR practices and procedures.

¶99 First, OLR closed the investigation against Attorney Kratz without the knowledge of the OLR director, Keith Sellen. How did that happen?[8]

¶100 Second, after reopening the investigation, OLR took 13 months to file a complaint against Attorney Kratz. What is the justification for this lengthy delay?

---

[7] Cf. S.V. v. Kratz, No. 10-C-919, 2011 WL 6151480 (E.D. Wis. Dec. 12, 2011). See Sexting lawsuit against former prosecutor settled, Appleton Post-Crescent, February 13, 2013, at A3-4.

[8] Referee Kinney wrote:

[T]he respondent's letter which self-reported the incident involving SVG was received by the OLR on December 8, 2009. The matter was closed on March 5, 2010 when the investigator received no response to her February 18, 2010 letter to SVG. The respondent was advised that the matter was closed at that point. It was then reopened by the OLR on September 24, 2010, more than 9 months after the respondent self-reported the SVG incident. The case simply sat in limbo for 9 months. While reports of other violations were then received, the closing of the file in March was obviously a mistake.

8

¶101 Third, after a long investigation, OLR filed three _sensational_ counts against Attorney Kratz that it later dismissed for lack of proof. Why did OLR's Preliminary Review Committee permit these counts to be filed? Is the Preliminary Review Committee serving its intended purpose of screening out improvident charges when it approves 98 percent of the OLR staff's recommendations?[9]

¶102 Fourth, OLR expects Attorney Kratz to pay all costs related to the prosecution of its improvident charges and its harsh desired level of discipline. Should a respondent attorney be expected to pay OLR's costs for charges that are not proven and a level of discipline sought but not imposed?

¶103 Fifth, OLR appears to be unwilling or unable to drop charges it has filed unless it acknowledges that the charges cannot be proved. It could likely have settled the Kratz matter much sooner if it had been able to bargain for something less than unconditional surrender. Should OLR have the authority to plea bargain with respondents? If so, under what conditions?

¶104 No doubt other questions could be raised about OLR's handling of the Kratz case. But apart from this single case, there are many reasons for this court to launch a thorough——strictly objective——review of the agency. If that review is undertaken, something useful may yet come out of this unfortunate tragedy.

---

[9] A 98 percent approval rate is the percentage OLR Director Keith Sellen recently cited in his October 25, 2013, testimony on Rule Petition 13-04 before the supreme court.