# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2022AP745-D |

| | |
|---|---|
| COMPLETE TITLE: | In the Matter of Disciplinary Proceedings Against Gary King, Attorney at Law:<br><br>Office of Lawyer Regulation,<br>   Complainant,<br>  v.<br>Gary King,<br>   Respondent. |

DISCIPLINARY PROCEEDINGS AGAINST KING

| | |
|---|---|
| OPINION FILED: | December 15, 2023 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|  COURT: | |
|  COUNTY: | |
|  JUDGE: | |

| | |
|---|---|
| JUSTICES: | |

Per curiam.

| | |
|---|---|
| ATTORNEYS: | |

2023 WI 77

NOTICE

This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.

No.  2022AP745-D

STATE OF WISCONSIN           :          IN SUPREME COURT

**In the Matter of Disciplinary Proceedings Against Gary King, Attorney at Law:**

**Office of Lawyer Regulation,**

        **Complainant,**

    **v.**

**Gary King,**

        **Respondent.**

**FILED**

**DEC 15, 2023**

Samuel A. Christensen
Clerk of Supreme Court

ATTORNEY disciplinary proceeding. *Attorney's license suspended.*

¶1  PER CURIAM.  We review the report of referee David A. Piehler recommending that this court suspend Attorney Gary King's license to practice law in Wisconsin for one year and require him to pay the full costs of this disciplinary proceeding, which are $5,927.83 as of September 20, 2023. Because no appeal has been filed, we review the referee's report and recommendation pursuant to Supreme Court Rule (SCR)

22.17(2).[1] Upon careful review of the matter, we agree with the referee's recommendations in all respects.

¶2 Attorney King was admitted to practice law in Wisconsin in 1998. He has no prior disciplinary history. The most recent address he furnished to the State Bar of Wisconsin is in Eau Claire, Wisconsin.

¶3 In 2012, Attorney King ran for and was elected Eau Claire County District Attorney. He was re-elected in 2016 and 2020.

¶4 On May 5, 2022, the Office of Lawyer Regulation (OLR) filed a complaint against Attorney King alleging two counts of misconduct, both arising out of his conduct as the Eau Claire County District Attorney.

¶5 Attorney King filed an answer to the complaint on May 31, 2022. Referee Piehler was appointed on July 14, 2022. On June 27, 2023, the parties entered into a stipulation whereby Attorney King withdrew his answer, entered a plea of no contest to the two counts of misconduct alleged in the complaint, and agreed that the referee could use the allegations of the complaint as an adequate factual basis in the record for a determination of violations of supreme court rules as to both counts of misconduct alleged in the complaint. The parties

---

[1] SCR 22.17(2) provides: "If no appeal is filed timely, the supreme court shall review the referee's report; adopt, reject or modify the referee's findings and conclusions or remand the matter to the referee for additional findings; and determine and impose appropriate discipline. The court, on its own motion, may order the parties to file briefs in the matter."

agreed that the appropriate level of discipline for Attorney King's misconduct was a nine-month suspension of his license to practice law. The parties filed a supplemental stipulation on July 28, 2023, in which Attorney King identified some potentially mitigating factors relating to the appropriate level of discipline. Specifically, Attorney King stated that he attributes his misconduct to personal or emotional problems he was experiencing at the time, and he described the two-year period detailed in the complaint as a particularly difficult time in his life, which included the deaths of family and friends and the isolation of the COVID quarantine. Attorney King stated that he has sought comprehensive treatment to deal with those personal or emotional problems. He also noted that he expressed remorse in his letter resigning as Eau Claire County District Attorney, saying "To the extent that any conduct fell short of the level expected of me, I sincerely apologize."

¶6 The referee issued his report and recommendation on September 1, 2023. The referee found that Attorney King committed the misconduct alleged in OLR's complaint. Rather than the nine-month suspension advocated by the parties, the referee concluded that a one-year suspension of Attorney King's law license was an appropriate sanction for his misconduct.

¶7 The allegations in OLR's complaint, which Attorney King admitted by virtue of his entry into the stipulation, detail problems concerning his behavior at work that began in 2018. E.H., the Office Manager for the Eau Claire County District Attorney's Office, reported to OLR that Attorney King

3

regularly appeared at the office in an "altered state." E.H. said he saw Attorney King slumped and sleeping in the office chairs of various attorneys and office staff, including during a discussion in E.H.'s office in which Attorney King fell asleep and remained sleeping for 10 to 15 minutes.

¶8 An Assistant District Attorney (ADA) reported that Attorney King would frequently come into attorneys' offices and interrupt their work, sometimes falling asleep in the attorney's office. A former ADA wrote a letter to Wisconsin Governor Tony Evers saying that she had witnessed Attorney King sleeping and snoring in meetings and court proceedings. In a contemporaneously written memo dated December 20, 2019, the former ADA wrote that Attorney King's "speech was slurred, his breathing labored, face red and he had a faint odor about him that I could not determine if it was hand sanitizer or an intoxicant." The memo went on to say that a few minutes later the former ADA heard loud snoring and observed Attorney King sleeping and asked two other people in the office to wake him.

¶9 T.G., the Eau Claire County Criminal Justice Director, told OLR about a meeting on October 21, 2019, with representatives of the Chicago Police Department in which Attorney King fell asleep for most of the meeting. Current and former District Attorney's Office employees told OLR that, around this time, Attorney King's temperament changed, with his temper becoming explosive and his behavior erratic and abusive. These individuals told OLR of instances in which Attorney King

yelled, swore, and shouted at his staff, leaving them feeling intimidated and afraid they would be fired.

¶10 On January 11, 2021, Attorney King missed a status conference. E.H. was contacted by a court staff member saying the court was waiting for Attorney King to appear. E.H. discovered Attorney King "slumped in his office chair at his computer, snoring and obviously asleep." E.H. was unable to awaken Attorney King, so he found an ADA to cover for Attorney King's failure to appear for the proceeding.

¶11 On February 16, 2021, Attorney King appeared in court. According to Deputy M.S., Attorney King could barely walk down the hall and had to brace against the wall to get to court. In her report to the Eau Claire County Sheriff, Deputy M.S. reported that Attorney King was not wearing a mask, which was unusual given that he had imposed strict mask policies for his staff. J.B., the Coordinator of the Office of Victim Services, was monitoring the hearing on Zoom and told OLR that Attorney King could not even say the word "Wisconsin" as he was "completely intoxicated."

¶12 Attorney King went to J.B.'s office after the hearing. J.P. told OLR that Attorney King "was slouched in his chair," with only "one eye open and his speech was heavily slurred." Attorney King stood up from his chair and was "unstable and ran into [J.B.'s] open door."

¶13 Sheriff Ron Cramer was advised about Attorney King's condition. Sheriff Cramer met with Attorney King and confronted him about his behavior and his appearing in court under the

5

influence of an intoxicant. Attorney King started to cry, rant, yell and scream, at which point J.B. and other office employees were evacuated to a safe location and sent home for the remainder of the day. Sheriff Cramer asked Attorney King to submit to a Preliminary Breath Test (PBT). Attorney King refused.

¶14 On June 1, 2021, Attorney King came to work appearing to be under the influence of an intoxicant. In a grievance filed with OLR, Judge Michael Schumacher said he observed Attorney King "nod off, jerk his head, and lose his balance for the next forty minutes." Judge Schumacher reported that Attorney King "appeared to be either suffering a serious medical incident or was severely intoxicated." Two Sheriff's Department personnel went to Attorney King's office on June 1, 2021, to perform a welfare check. They also asked Attorney King to submit to a PBT. He refused.

¶15 Judge Sarah Harless, apprised by Judge Schumacher that Attorney King appeared to be either ill or intoxicated, met with Attorney King prior to a sentencing hearing. Judge Harless asked Attorney King to submit to a PBT. An officer performed the PBT and obtained a "weak breath sample." The test showed a reading of .047. Judge Harless adjourned the sentencing hearing and filed a grievance with OLR. In the grievance, Judge Harless reported that "[Attorney] King's eyes were red and bloodshot and I also observed a faint odor of intoxicants."

¶16 OLR's complaint alleged the following count of misconduct with respect to Attorney King's behavior at work:

6

- Count One:  By sleeping through a January 2021 court hearing, appearing in a February 2021 court hearing while under the influence of intoxicants or otherwise impaired, and appearing in a June 2021 court hearing while under the influence of intoxicants or otherwise impaired, Attorney King violated SCR 20:1.1.[2]

¶17 The complaint also detailed incidents of sexual harassment by Attorney King directed toward J.B.  The Office of Victim Services is a special unit within the Eau Claire County District Attorney's Office that is designed to provide information, support, and advocacy to all crime victims, witnesses, and family members of adult and juvenile offenders. J.B. is the Coordinator of the Office of Victim Services and supervises the department, which includes five employees.  J.B. was also part of Attorney King's management team.  She reported directly to the Office Manager, E.H., as well as Attorney King.

¶18  From the time J.B. began employment at the District Attorney's Office in 2013 until July 2019, J.B.'s interactions with Attorney King, although limited, were cordial and professional.

¶19  In July 2019, J.B. and her husband attended the wedding of an office employee.  J.B. told OLR that Attorney King also attended the wedding and that he was intoxicated.  Attorney

---

[2] SCR 20:1.1 provides:  "A lawyer shall provide competent representation to a client.  Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."

7

King made a number of statements to J.B.'s husband complimenting J.B. J.B. found the comments odd since she did not often interact with Attorney King.

¶20 After the July 2019 wedding, Attorney King began paying extra attention to J.B. He would frequent her office, whereas in the past he would communicate with her and other staff members mostly through email. He would comment on J.B.'s hair and clothes and express opinions on how her hair was styled or how she dressed. On one occasion, Attorney King told J.B. she could not wear a particular dress because it was "too distracting." J.B. said Attorney King then "looked me up and down." J.B. was confused by the interaction and asked a colleague if the comment was sexual or simply "joking." Neither J.B. nor her colleague believed J.B.'s dress was inappropriate for work or revealing. Attorney King's comments about J.B.'s appearance continued, and at some point before the end of 2019, J.B. told her supervisor and the Deputy District Attorney that the comments were making her uncomfortable.

¶21 As time passed, Attorney King's comments to J.B. became more sexual. In March 2020, Attorney King took J.B. to breakfast and talked "dirty" with her. He joked that they should stop by a local hotel, take a picture outside the hotel or inside a room and send it to E.H. J.B. consulted with E.H. since she felt the conduct was inappropriate and more than just "joking."

¶22 In other incidents during 2020, Attorney King told J.B. repeatedly that she was appearing in his dreams and that

8

she "needed to stay out of his dreams." On another occasion, Attorney King hugged J.B. twice, then pulled out her ponytail and began playing with her hair. Attorney King mentioned to J.B. the possibility of having a "threesome" with someone who lived near the District Attorney's Office.

¶23 In another incident, Attorney King suggested to a female administrative specialist that they "make out" in her office, a comment that stunned her. This comment echoed a similar comment Attorney King had made to J.B. after another wedding event that J.B. did not attend. Attorney King said J.B. "was supposed to be there because he and [J.B.] were going to sit in the corner and make out so everybody could start talking about us."

¶24 On another occasion, Attorney King approached J.B. in her office, took off her shoes, and began rubbing her feet. By this time, office employees had initiated an informal safety plan because Attorney King was regularly coming into J.B.'s office and closing the door. The plan involved employees coming to J.B.'s office and interrupting Attorney King's interactions with her.

¶25 In January 2021, Attorney King appeared in J.B.'s office and started to cry. He pulled J.B. from behind and made her sit in his lap, prevented her from leaving, and patted her. When J.B. got up and returned to her desk, Attorney King told her that he loved her. He then approached her while she was sitting in her chair, hugged her from behind, took off her mask,

and tried to kiss her on the lips. J.B. immediately told E.H. about the interaction.

¶26 Attorney King's attentions to J.B. continued in February 2021. He asked J.B. about her sex life with her husband and said "if you came to me in a vulnerable state, I could not say no to you." Attorney King told J.B. that he "used to think she was the kind of girl he could take to the Super 8 but now knows he has to take her somewhere fancier like the Lismore." He told her he wanted "to be with you in your lifestyle." He suggested that he send an email to staff suggesting that the two of them, both married, were "together."

¶27 On another occasion, Attorney King commented on another female employee's shirt and touched her and the shirt in a lingering, inappropriate manner. Attorney King told the woman that she looked "really saucy" and ran his eyes up and down her body.

¶28 On February 10, 2021, J.B. contacted human resources to report that Attorney King was sexually harassing her. Eau Claire County commenced an investigation into J.B.'s complaint. After interviewing multiple witnesses, Attorney Mindy Dale wrote a report to the Eau Claire County Human Resources Director concluding that Attorney King "did make inappropriate comments to women, most notably [J.B.], which made them uncomfortable. Further, he should not have kissed [J.B.] on the cheek or pulled her on to [his] lap, regardless of the emotions he was feeling at the time." Attorney Dale recommended that a copy of her

10

letter and related reports be forwarded to the Department of Administration for "further consideration and disposition."

¶29 Attorney King resigned as Eau Claire County District Attorney in August 2021.

¶30 OLR's complaint alleged the following count of misconduct with respect to Attorney King's sexual harassment of female employees at work:

- Count Two: By making multiple inappropriate sexual comments to female employees in his office, and engaging in unwanted sexual contact with J.B., Attorney King violated SCRs 20:8.4(g),[3] 20:8.4(i),[4] and 40.15.[5]

¶31 The referee found the factual statements contained in the complaint, the comprehensive stipulation, and the supplemental stipulation to be true. The referee also found, based on the facts in the record, that Attorney King violated the Supreme Court Rules as alleged in the complaint. The referee noted that in determining the appropriate sanction for

---

[3] SCR 20:8.4(g) provides: "It is professional misconduct for a lawyer to violate the attorney's oath."

[4] SCR 20:8.4(i) provides: "It is professional misconduct for a lawyer to harass a person on the basis of sex, race, age, creed, religion, color, national origin, disability, sexual preference or marital status in connection with the lawyer's professional activities. Legitimate advocacy respecting the foregoing factors does not violate par. (i)."

[5] SCR 40.15 states, in pertinent part: "I will abstain from all offensive personality and advance no fact prejudicial to the honor or reputation of a party or witness, unless required by the justice of the cause with which I am charged."

11

Attorney King's misconduct he must consider the seriousness, nature and extent of the misconduct; the level of discipline needed to protect the public; the need to impress on the attorney the seriousness of the misconduct; and the need to deter other attorneys from similar misconduct.  In concluding that a one-year suspension, rather than the nine months proposed by the parties, was the appropriate level of discipline for Attorney King's transgressions, the referee said:

> The aggravating factors of selfish motive, pattern of misconduct, substantial experience in the law, and vulnerable victim carry far more weight . . . than the mitigating factors of absence of prior discipline, personal or emotional problems, other consequences, and expression of remorse.  This is particularly so where the respondent was the District Attorney, responsible for overseeing law enforcement in his county.  As such, he should have upheld the highest standards of behavior, of which he fell short in his treatment of his staff.  In addition, when he was incapacitated (apparently due to his own choices), he was possessed of a staff to whom he could delegate duties which he could not personally carry out, yet did not do so.
>
> Turning to the factors relevant to assessing discipline, the seriousness, nature, and extent of misconduct and the level of discipline required to protect the public both militate for significant discipline.  Although the respondent's behavior never crossed the line into the realm of criminal activity, it was nonetheless substantial and prolonged.  Further, the respondent's job was to competently represent the public, a task where he fell short. . . . I believe the need to impress on the respondent the seriousness of his misconduct is of lesser concern here.  His resignation from office made this point already.  The need for deterrence is, however, an important consideration.  Attorneys must understand that sexual misconduct, whether directed toward clients, employees, or the public, will not be

12

> tolerated. It undermines the mission of the bar to be an instrument of justice, it degrades the profession, and it harms its victims.
>
> Considering the entirety of the facts of this matter, I deem a 9-month suspension inadequate and believe a one-year suspension is appropriate.

¶32 We will affirm a referee's findings of fact unless they are clearly erroneous. See In re Disciplinary Proceedings Against Eisenberg, 2004 WI 14, ¶5, 269 Wis. 2d 43, 675 N.W.2d 747. The court may impose whatever sanction it sees fit, regardless of the referee's recommendation. See In re Disciplinary Proceedings Against Widule, 2003 WI 34, ¶44, 261 Wis. 45, 660 N.W.2d 686. There is no showing that any of the referee's findings of fact are clearly erroneous, and we adopt them. We are also in accord with the referee's legal conclusions that Attorney King violated the Supreme Court Rules noted above.

¶33 As to the appropriate level of discipline, after careful consideration, we agree with the referee that a one-year suspension of Attorney King's license to practice law in Wisconsin is appropriate.

¶34 Although we often say that no two disciplinary matters are identical, we strive to identify cases that are somewhat analogous and impose a similar level of discipline. As the referee aptly points out, it is particularly difficult to compare cases involving sexual misbehavior by attorneys, especially since this court has recently stated that it is "applying increasing scrutiny to attorneys' sexual misconduct." See In re Disciplinary Proceedings Against DeLadurantey, 2023 WI

13

17, ¶53, 406 Wis. 2d 62, 985 N.W.2d 788; In re Disciplinary Proceedings Against Ritland, 2021 WI 36, ¶¶37, 39, 396 Wis. 2d 509, 957 N.W.2d 540. As a result, as the referee notes, and as OLR also recognized in its memorandum in support of the parties' comprehensive stipulation, if disciplinary decisions involving sexual misbehavior issued in years past were to come before the court today, the sanctions would likely be greater than the ones imposed. See, e.g., In re Disciplinary Proceedings Against Kratz, 2014 WI 31, 353 Wis. 2d 696, 851 N.W.2d 219. (District Attorney's law license suspended for four months for six counts of misconduct that included sending sexually suggestive text messages to a domestic abuse crime victim and making sexually suggestive comments to social workers.)

¶35 This court described then-District Attorney Kratz's conduct as "appalling," "exploitive," "crass," and "sanctionably sophomoric." Id. at ¶47. It discounted Attorney Kratz's claim that his misconduct resulted from various addictions. Id, ¶48. Here, the referee noted that this court used the Kratz case as a measuring stick when deciding the appropriate sanction to impose in In re Disciplinary Proceedings Against Baratki, 2017 WI 89, 378 Wis. 2d 1, 902 N.W.2d 250. Attorney Baratki faced nine counts of misconduct, including sending a client flirtatious, sexual text messages and, during a meeting, lifting the client's shirt and kissing her abdominal area. This court suspended Attorney Baratki's license for six months, saying, "Given his course of conduct, we deem it imperative that, to resume the practice of law in Wisconsin, Attorney Baratki show this court

14

that he has taken steps to avoid similar misdeeds in the future." Id., ¶34.

¶36 In DeLadurantey, we made clear that, going forward, we would be more critically evaluating the appropriate sanction to impose in cases involving attorneys' sexual misconduct. We explained:

> We do so because sexual harassment comes at a heavy price for victims who can suffer significant psychological effects as well as job-related costs, including job loss, reputational harm, impairment of professional opportunities, and irreparable damage to interpersonal relationships at work. Attorneys should be on notice that sexual misconduct by attorneys, whether directed toward fellow lawyers, clients, or others, is not taken lightly.

Id. ¶53.

¶37 While he was serving as District Attorney, Attorney King harassed multiple women over whom he had supervisory authority. His misconduct included not only verbal harassment but also unwelcome physical contact. His harassment in the workplace created a hostile working environment that persisted over the course of two years. Attorney King's behavior warrants a significant sanction.

¶38 In addition to the sexual misbehavior, Attorney King, while serving as District Attorney, appeared in the office, as well as in court, while either intoxicated or otherwise impaired. His coworkers reported that he was erratic and abusive. Two judges reported Attorney King's erratic behavior. On one occasion the Sheriff was advised of the situation and confronted Attorney King. That confrontation led to Attorney

15

King becoming so upset and unbalanced that employees had to be evacuated to a safe location and sent home for the rest of that work day. As OLR noted in its memorandum in support of the comprehensive stipulation:

> The fact that [Attorney] King was the top law enforcement official in the county heightens the concern that he was showing up in court and at work incapacitated——his constituents and his coworkers deserved more. These allegations buttress OLR's conclusion that [Attorney] King's misconduct merits significant discipline.

¶39 After careful review of this matter, we conclude that Attorney King's misconduct warrants a more severe sanction than was imposed in Kratz and Baratki. We agree with the referee that a one-year suspension of Attorney King's license to practice law is an appropriate sanction for his misconduct.

¶40 We now turn to the issue of costs. Our general practice is to impose the full costs of a disciplinary proceeding on attorneys who are found to have committed misconduct. See SCR 22.24(1m). There is no reason to depart from that general practice here. We therefore impose full costs.

¶41 IT IS ORDERED that the license of Gary King to practice law in Wisconsin is suspended for a period of one year, effective January 19, 2024.

¶42 IT IS FURTHER ORDERED that within 60 days of the date of this order, Gary King shall pay to the Office of Lawyer Regulation the costs of this proceeding, which are $5,927.83.

16

¶43 IT IS FURTHER ORDERED that Gary King shall comply with the provisions of SCR 22.26 concerning the duties of an attorney whose license to practice law has been suspended.

¶44 IT IS FURTHER ORDERED that compliance with all conditions of this order is required for reinstatement. See SCR 22.29(4)(c).

1